UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLEN CRAIG,

                    Plaintiff,

            -v-                                        16-CV-5439 (JPO)

UMG RECORDINGS, INC., et al.,                          OPINION AND ORDER
                    Defendants.

J. PAUL OETKEN, District Judge:

Plaintiff Glen Craig ("Craig") is a photographer who took a few good shots of the great musician Riley B. King, known as "B.B. King." He brought this lawsuit against UMG Recordings, Inc. ("UMGI"), Kingsid Ventures, Ltd. ("Kingsid"), and the Estate of Riley B. King (the "Estate") (collectively, "Defendants") for copyright infringement after UMGI released several music albums with Craig's photos in them. Defendants have moved for summary judgment in favor of Kingsid and the Estate and partial summary judgment in favor of UMGI. In addition, Defendants have moved for sanctions against Craig and his counsel, Richard Liebowitz and the Liebowitz Law Firm PLLC, for filing a meritless motion to disqualify Defendants' expert witness. For the reasons that follow, Defendants' summary judgment motion is granted in part and denied in part. Defendants' motion for sanctions is granted with respect to Richard Liebowitz and the Liebowitz Law Firm PLLC.

I.     **Background**

       A.     **Factual Background**

The following facts are drawn from the complaint and the parties' Rule 56.1 statements and are not subject to genuine dispute unless otherwise noted.

EXHIBIT 7
Page 1 of 22

The renowned Riley B. King ("King"), professionally known as B.B. King, "was one of the greatest guitarists and blues performers of all time." (Dkt. No. 92 ¶ 1.) Plaintiff, Glen Craig, is a photographer who took several pictures of King during King's music tours. (Dkt. No. 1 ("Compl.") ¶¶ 5, 9; *see also* Dkt. No. 92 ¶ 3.) Among the pictures Craig took, three appeared in a tour book published in 1971 featuring King. (Dkt. No. 92 ¶ 5.) It is these three photographs (the "Photographs") that are at issue in this case. (*See* Dkt. No. 1-1.)

Defendant UMGI is a Delaware corporation in the business of selling, manufacturing, distributing, and otherwise exploiting sound recordings in the United States. (Dkt. No. 92 ¶¶ 21, 23.) Craig alleges that UMGI published a series of recordings of King's music that used the Photographs without his permission. (Compl. ¶ 12.) He further alleges that Defendant Kingsid—a company organized to license King's name to third parties—and the Estate facilitated and benefitted from UMGI's sales. (*Id.*; Dkt. No. 92 ¶ 16.)

In his complaint, Craig specifies 43 allegedly infringing albums ("King Albums") that were released at various times between 1971 and 2015.[1] (*See generally* Compl. ¶¶ 13–55.) Among them, 29 albums are published outside the United States by foreign corporate entities. (Dkt. No. 92 ¶ 24.) All of these entities, except for one, share the "Universal" name or have some affiliation with UMGI's parent company. (Dkt. No. 92 ¶¶ 21, 25.) Between July 7, 2013 and July 7, 2016, UMGI sold copies of 13 of the allegedly infringing albums within the United States. (Dkt. No. 92 ¶ 35.)

Craig registered his copyright for the Photographs in March 2014. (Dkt. No. 92 ¶ 7.) In June 2014, Craig reached out to UMGI to retrieve the originals of the Photographs for an

---

[1] Defendants contend that there are only 42 albums at issue because the albums referred to in paragraphs 22 and 39 of the complaint are the same. But Craig disagrees. (Dkt. No. 92 ¶ 13.)

EXHIBIT 7
Page 2 of 22

exhibition and was provided with copies of certain King CDs that featured the Photographs. (Dkt. No. 92 ¶¶ 8, 10; *see also* Dkt. No. 80-3.)  Craig's then-attorney subsequently sent a cease-and-desist letter to UMGI in September 2014, informing UMGI of the alleged infringement.[2] (Dkt. No. 92 ¶ 11; Dkt. No. 91-3.)  Unable to resolve the matter amicably, Craig initiated this action against Defendants on July 7, 2016, asserting a Copyright Act claim and a Digital Millennium Copyright Act ("DMCA") claim.

### B.      Procedural Background

At the close of expert discovery, Craig filed a motion to disqualify Defendants' proposed expert witness, Professor Jeffrey Sedlik ("Sedlik").  (Dkt. No. 55.)  After the parties had fully briefed this issue, the Court denied Craig's motion following an evidentiary hearing on May 25, 2018.  (Docket Entry on May 25, 2018.)  Defendants then filed a motion for sanctions—pursuant to 28 U.S.C. § 1927 and this Court's inherent power—against Craig and his counsel, Richard Liebowitz and the Liebowitz Law Firm PLLC, for fees and expenses in connection with the motion to disqualify.  (Dkt. No. 71.)  Separately, they also moved for summary judgment.  (Dkt. No. 77.)  Both motions are now fully briefed and ripe for resolution.

## II.     Legal Standards

### A.      Motion for Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

---

[2] Defendants contend that the cease-and-desist letter was received by UMGI in November 2014.  (Dkt. No. 92 ¶ 11.)

EXHIBIT 7
Page 3 of 22

a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence."  *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).  The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lund's, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

### B.  Motion for Sanctions

To succeed on a motion for sanctions under § 1927 or the court's inherent powers, the movant must demonstrate "clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes."  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000) (quoting *Agee v. Paramount Commc'ns Inc.*, 114 F.3d 395, 398 (2d Cir. 1997)); *see also Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986).  Bad faith can be established by inference from a party's decision to pursue completely meritless claims.  *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000).

EXHIBIT 7
Page 4 of 22

## III.    Discussion

### A.    Motion for Summary Judgment

The Court begins with the claims under the Copyright Act, and then turns to the claims

asserted under the DMCA.

### 1.    Liability under the Copyright Act

Defendants move for summary judgment on the copyright claims in favor of Kingsid and

the Estate; they move for partial summary judgment in favor of UMGI.  Each is addressed in

turn.

### a.    Liability of Kingsid

Defendants move for summary judgment on Craig's claims against Kingsid on the

ground that Craig does not adduce any evidence from which a reasonable juror could infer

Kingsid's involvement in the alleged copyright infringement.  (Dkt. No. 78 at 9–10.)  Kingsid is

simply a company organized "to license Mr. King's name to third parties."  (Dkt. No. 92 ¶ 16.)

Craig has failed to adduce any evidence to substantiate his claim that "Kingsid . . . improperly

facilitated and wrongly benefited" from the alleged copyright infringement (Compl. ¶ 12), and

in fact concedes that "the record is insufficiently developed as to [Kingsid's] involvement in the

infringing activity" (Dkt. No. 90 at 2 n.1).  Therefore, the Court grants summary judgment in

Kingsid's favor.  *See Lessem v. Taylor*, 766 F. Supp. 2d 504, 515 (S.D.N.Y. 2011) (granting

summary judgment to entities that had "[no]thing to do with the copyright infringement alleged

in th[e] case").

### b.    Liability of the Estate

Defendants next argue that summary judgment should also be granted in favor of the

Estate because the record contains no evidence that the Estate has produced, distributed, or

improperly benefited from any of the allegedly infringing albums.  (Dkt. No. 78 at 9–10.)  In

EXHIBIT 7
Page 5 of 22

response, Craig contends that a reasonable jury could potentially find the Estate liable because its trustee and executor, Louise LaVerne Toney ("Toney"), reviewed all album releases and received royalties from UMGI.  (Dkt. No. 1 ¶ 8; Dkt. No. 90 at 5.)

To start with, Craig mischaracterizes the record.  Nothing in the deposition excerpt cited by Craig supports his allegation that Toney "receive[d] all album releases from UMGI, *delivered to her for review*."  (Dkt. No. 90 at 5 (emphasis added).)  To the contrary, Toney testified that she has never had any approval power over UMGI's release of albums.  (Dkt. No. 94-1 at 59:8–61:6.)  Therefore, viewed in the light most favorable to Craig, the record can, at best, support the inference that the Estate has received royalties and communications about upcoming album releases.  So, the question is whether receiving communications and royalties in connection with the allegedly infringing albums can render the Estate liable for infringement.  The Court answers this question in the negative.

To establish direct liability for copyright infringement, a plaintiff must show that a defendant has "engaged in some volitional conduct sufficient to show that [it] actively" violated plaintiff's copyright.  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009); *see also Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) ("[V]olitional conduct is an important element of direct liability . . . .").

"Here, there is no evidence establishing direct liability, since [Craig] cannot point to volitional conduct by [the Estate] that caused" the alleged infringement.  *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011).  Rather than having any hand in producing or marketing the allegedly infringing actions, Toney only passively received royalties and communications about album releases from UMGI.  *Cf. id.* at 319.  No evidence in the record shows that Toney delivered the Photographs to UMGI or cooperated in any way with UMGI

EXHIBIT 7
Page 6 of 22

regarding the use of the Photographs in the album production. Absent such evidence, there is no genuine factual dispute as to whether the Estate has engaged in any volitional conduct that renders it potentially liable for direct infringement. *Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 611 (S.D.N.Y. 2014) (holding that even a vicarious liability claim predicated on the receipt of royalties from an infringing product requires some showing that the defendant "had the power to stop the infringements"). The Estate is entitled to summary judgment on all of Craig's claims against it.[3]

### c.    Liability of UMGI (Foreign Albums)

UMGI argues that it cannot be held liable for the 29 allegedly infringing albums ("Foreign Albums") released outside the United States by foreign corporate entities. UMGI makes three arguments: (1) UMGI did not manufacture or distribute the Foreign Albums, (2) UMGI and the foreign affiliates that released the Foreign Albums are separate corporate entities, and (3) the Copyright Act does not cover extraterritorial infringements. (Dkt. No. 78 at 10–12.) The Court begins with UMGI's argument regarding the extraterritorial application of the Copyright Act.

"It is well established that copyright laws generally do not have extraterritorial application." *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). But if a defendant (1) commits a predicate infringing act—such as the unauthorized manufacture of copyrighted material—in the United States, and (2) the act permits further reproduction abroad, the defendant might be liable for related infringing acts occurring outside the country. *See Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1101 (2d Cir. 1976).

---

[3] Craig does not make any allegations as to the Estate's vicarious or contributory infringement, so the Court need not discuss these alternative theories of liability.

EXHIBIT 7
Page 7 of 22

Among the Foreign Albums, Craig fails to adduce any evidence to show that UMGI has committed any predicate act with regard to 21 of them. UMGI is therefore entitled to summary judgment with respect to claims related to these albums. As to the remaining eight Foreign Albums that are named as "Ladies and Gentlemen, Mr. B.B. King" (the "LG Albums"), the evidentiary record compels a different result. (Compl. ¶¶ 23–24, 33–38.)

In particular, the evidentiary record could support the inference that UMGI has, through its employee Ryan Null ("Null"), transmitted an unauthorized copy of one of the Photographs (the "Star Photograph") from within the United States to UMGI's UK affiliate to produce an album named "Ladies and Gentlemen, Mr. B.B. King." (Dkt. No. 91-1 ("Null Depo.") at 129:4–9.) The evidentiary record would also allow a reasonable jury to conclude that the LG Albums have used the Star Photograph as their album covers.[4] (*See* Dkt. No. 1, ¶¶ 23–24, 33–38; *compare* Dkt. No. 1-1 at 2, *with* Dkt. Nos. 1-12, 1-13, 1-22–1-27.) The question is whether UMGI's transmission of an unauthorized copy of the Star Photograph from within the United States would constitute a domestic copyright infringement that "permits further reproduction abroad." *Robert Stigwood Grp. Ltd.*, 530 F.2d at 1101.

UMGI argues that its conduct does not amount to a predicate act because it was "the UK [a]ffiliate, not Mr. Null or UMGI, [that] chose to use the [infringing photo]." (Dkt. No. 93 at 5.) Yet UMGI's argument is a non sequitur. Copyright laws protect a creator's reproduction right. 17 U.S.C. § 106(1). In particular, "[c]ourts have consistently held that the unauthorized duplication of digital . . . files over the Internet infringes a copyright owner's exclusive right to reproduce." *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013). In

---

[4] UMGI never disputes that the cover photos of the LG Albums are derived from the Star Photograph.

EXHIBIT 7
Page 8 of 22

addition, "unauthorized transfer of a digital . . . file over the Internet" also "constitutes

reproduction within the meaning of the Copyright Act." *Id.* Null admitted in his deposition that

he pulled out the Star Photograph from UMGI's digital files and sent it to UMGI's UK affiliate

to produce an album named "Ladies and Gentlemen, Mr. B.B. King." (Null Depo. at 128:15–

129:9, 131:22–132:6; 132:12–22.) Null's acts of pulling the Star Photograph from a database

and sending it over the Internet to the UK affiliate necessarily involve the acts of duplicating and

transferring a digital file over the Internet. Therefore, even assuming that Null and UMGI did

not make the decision to use this photo in the album, Null's unauthorized transfer of this photo—

in which Craig allegedly holds the copyright—is sufficient to constitute a predicate act for

purposes of the Copyright Act. *Capitol Records*, 934 F. Supp. 2d at 648–51 (holding that

unauthorized online transfer of digital musical files infringes copyright owner's reproduction

right); *Update Art, Inc.*, 843 F.2d at 73 (observing that illegal reproduction of a copyrighted

work in the United States constitutes a predicate act).

      Having concluded that the evidence could support the inference that UMGI, through its

employee Null, committed a predicate act of infringement in the United States, the Court next

considers whether the act is one that "permits further reproduction abroad." *Robert Stigwood

Grp. Ltd.*, 530 F.2d at 1101. As a matter of law, sending a digital photograph to someone abroad

enables that foreign user to make additional infringing copies. Consequently, UMGI could be

liable for the sale of the LG Albums that have used an unauthorized copy of the Star Photograph.

      Given that the bar on the extraterritorial application of the Copyright Act does not shield

UMGI from liability in connection with the LG Albums, the Court next considers UMGI's other

two arguments in support of partial summary judgment.

EXHIBIT 7
Page 9 of 22

Those two arguments miss the point. The crux of Craig's theory of liability is not that UMGI manufactured or distributed the Foreign Albums or that the corporate veil between UMGI and its foreign affiliates ought to be pierced. Instead, Craig argues that UMGI's liability arises from its alleged reproduction and transmission of an infringing photograph to its UK affiliate. (Dkt. No. 90 at 7–8.) Therefore, even accepting that UMGI did not manufacture or distribute the Foreign Albums, and that the corporate distinctions between UMGI and its affiliates are to be respected, to the extent that a reasonable jury could find that UMGI committed a domestic infringement that enabled its foreign affiliates to commit further infringements abroad, UMGI can be liable for those further infringements under the governing law. *Robert Stigwood Grp. Ltd.*, 530 F.2d at 1101; *Update Art, Inc.*, 843 F.2d at 73.

Therefore, Defendants' motion for summary judgment is denied with respect to the claims against UMGI related to the LG Albums, and is granted with respect to the claims related to the remaining Foreign Albums.

### 2. Damages Under the Copyright Act

The Court next turns to the question of damages. Defendants seek to limit the scope of potential damages in several ways. They argue that (1) Craig's damages award should be limited to damages arising from sales that occurred between July 7, 2013 and July 7, 2016, (2) Craig's actual damages should be limited to $9,452.21, (3) Craig is not entitled to any of UMGI's profits, (4) Craig is not entitled to any statutory damages, and (5) even if Craig is granted statutory damages, Craig's award should be limited to the amounts recoverable for innocent infringement. The Court addresses each proposed limitation in turn.

### a. Statute of Limitations

Defendants first argue that, to the extent that any damages are awarded, they should be limited to those arising from sales that occurred within three years of the filing of this suit—sales

EXHIBIT 7
Page 10 of 22

that occurred between July 7, 2013 and July 7, 2016.[5]  (Dkt. No. 78 at 12–13.)  Craig contends

that damages should be calculated on the basis of sales from July 7, 2013 to the present.  (Dkt.

No. 90 at 9.)  The Court agrees with Craig that the period for which damages are available is July

7, 2013 to the present.

     Any civil action asserting a claim based on a Copyright Act violation must be brought

within three years after the accrual of the claim.  17 U.S.C. § 507(b).  This Circuit has adopted

the "discovery rule" to determine when a plaintiff's copyright claim accrues.  *Psihoyos v. John*

*Wiley & Sons, Inc.*, 748 F.3d 120, 124–25 (2d Cir. 2014).  Under this rule, a plaintiff's claim

accrues when "the copyright holder discovers, or with due diligence should have discovered, the

infringement."  *Id.* at 124.  After a plaintiff has established the timeliness of his or her claim with

respect to any one particular act, courts in this Circuit have taken a "rolling" approach to the

calculation of damages with respect to any other acts of infringement, which allows a plaintiff to

recover damages for only those infringing acts that occurred within three years of the filing of

the complaint.  *Papazian v. Sony Music Entm't*, No. 16 Civ. 7911, 2017 WL 4339662, at *4

(S.D.N.Y. Sept. 28, 2017) (citing *Merchant v. Levy*, 92 F.3d 51, 57 n.8 (2d Cir. 1996)).

     The parties agree that for purposes of calculating damages, the Court may rely on only

those acts of infringement that have occurred since July 7, 2013—three years prior to the filing

of this suit.  (*Id.*)  But they fight over whether Craig can collect damages for acts of infringement

that have occurred *after* he filed his lawsuit.  (Dkt. No. 90 at 9; Dkt. No. 93 at 5.)

---

[5] Defendants also argue that damages should be further limited to damages that arise from
the sales of thirteen specific albums that, as Craig concedes (Dkt. No. 92 ¶ 35), were the only
albums UMGI sold in the United States during this period.  But, as the Court has already held,
UMGI may also be liable for foreign sales of the LG Albums in addition to the domestic sales of
these thirteen albums.

EXHIBIT 7
Page 11 of 22

Defendants' argument is counterintuitive. According to Defendants' logic, a plaintiff would have to file continuous complaints to capture damages from violations occurring *after* he or she has already filed the first lawsuit that put a defendant on notice of the alleged infringement. Such a rule is contrary to the speedy and efficient resolution of disputes and conservation of judicial resources. Indeed, none of the authorities cited by Defendants supports their argument. Instead, those cases discuss how far *back* in time from the filing of the complaint damages would extend, rather than whether a plaintiff can recover damages for ongoing damages *after* the filing of the complaint. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 677 (2014) ("[A] successful plaintiff can gain retrospective relief only three years back from the time of suit."); *Papazian*, 2017 WL 4339662, at *6 ("Plaintiff cannot recover damages for infringing acts that occurred . . . three years before he filed his complaint.").

The Court declines to follow Defendants' invitation to limit the damages period to the filing of the complaint. Therefore, July 7, 2013 to the present (the "Relevant Period") is the proper time period for purposes of calculating damages. To sum up, Craig's maximum damages are limited to those arising from the sale of the 13 albums in the United States and the LG Albums abroad between July 6, 2013 and the present.

### b. Actual Damages

The Copyright Act entitles copyright owners to two types of compensatory damages: actual damages and infringers' profits. 17 U.S.C. § 504(a)(1). These two types of damages serve different purposes and are based on different financial data. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001). Here, Defendants seek to cap Craig's actual damages at $ 9,452.21 on the basis of their expert opinion. (Dkt. No. 78 at 13–15.) Craig objects to

EXHIBIT 7
Page 12 of 22

Defendants' figure by questioning the adequacy of Defendants' expert opinion.  (Dkt. No. 90 at 11–12.)

Defendants' $ 9,452.21 calculation takes into account only the thirteen albums sold in the United States, and not any of the Foreign Albums.  (Dkt. No. 62-7 at 9, 27–28.)  As the Court explained above, UMGI's liability for the LG Albums sold abroad is still a triable issue.  Therefore, the Court cannot conclude at the summary judgment stage that no factual dispute exists as to the maximum amount of actual damages to which Craig might be entitled.  Defendants' motion for summary judgment with respect to the actual damages calculation is denied.

### c.    Infringers' Profits

Next, the Court turns to infringers' profits.  The Copyright Act awards infringers' profits to ensure that infringers do not benefit from their wrongdoing.  *On Davis*, 246 F.3d at 159.  The statute adopts a burden-shifting framework: first, "the copyright owner is required to present proof only of the infringer's gross revenue," and second, "the infringer is [then] required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  The Second Circuit interprets "gross revenue" under the Copyright Act as "gross revenue reasonably related to the infringement, not unrelated revenues."  *On Davis*, 246 F.3d at 160.

Here, the parties dispute whether Craig has carried his initial burden of adducing evidence of any "revenues reasonably related to the infringement."  *Id.*  Craig has set forth the gross revenue earned by UMGI in 2014–2016 from the sale of the allegedly infringing albums in his expert's opinion.  (Dkt. No. 80-6 at 5.)  But Defendants attack the "causal connection" between the Photographs and UMGI's revenue from selling the allegedly infringing albums.

EXHIBIT 7
Page 13 of 22

(Dkt. No. 78 at 16.)  According to Defendants, the Photographs and UMGI's revenue are not
"reasonably related," *On Davis*, 246 F.3d at 160, because "all of UMGI's profits are attributable
to Mr. King" (Dkt. No. 78 at 17).

The evidence in the record, interpreted in the light most favorable to non-movant Craig,
is sufficient to lead a reasonable jury to conclude that UMGI's revenues from selling the King
Albums are reasonably related to the allegedly infringing photographs.  The Photographs used as
album covers feature prominently on those albums.  Indeed, the Photographs are most likely the
first things that catch a customer's eye when she is browsing the shelves either in a physical store
or online.  It is true that King is a great musician and that many people purchase his albums
solely for the music.  But it would be disingenuous to argue that the cover design does not affect
the overall quality of an album, customers' willingness to buy, and, consequently, album sales.
As UMGI itself admits, "[UMGI] really [is] careful about what [it] choose[s] for a cover."  (Null
Depo. 39:11–12.)  Indeed, its employees are expected to "research as many [photographs] as
[they] need to until [they] find the correct photo that's appropriate or the correct creative choice
that the art director or the designer or anyone else would approve to be used from a creative
standpoint," because UMGI is "more concerned with the cover . . . than what shows up inside."
(*Id.* 38:16–21, 39:14–15.)  It cannot be said to be beyond genuine dispute that the revenues are
not reasonably related to the photographs,

The cases cited by UMGI are inapposite.  The out-of-circuit case *Mackie v. Rieser*, 296
F.3d 909 (9th Cir. 2002), discusses the relationship between an infringing artwork used in a
promotional brochure for the Seattle Symphony Orchestra and the current and future profits the
Orchestra generated after using that photo, *id.* at 911.  There, the infringing artwork was in only
"one page in a multi-page brochure that advertised a series of concerts that were unrelated to the

EXHIBIT 7
Page 14 of 22

artwork itself." *Id.* at 916.  It is distinguishable because the Photographs here feature King

himself and are probably the most important image component of the albums.  Also, unlike the

three-second appearance of an infringing design in a 44-minute broadcast which "[o]ne could

miss . . . in a blink of the eye," the Photographs used in the infringing albums are at the front and

center of each album sold.  *Mager v. Brand New Sch.*, No. 03 Civ. 8552, 2004 WL 2413978, at

*4 (S.D.N.Y. Oct. 28, 2004).  In short, the evidence in the record "is sufficient to lead a

reasonable jury to conclude that [UMGI's album sales] are reasonably related to the allegedly

infringing photographs." *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 Civ. 934,

2018 WL 3059650, at *7 (S.D.N.Y. June 20, 2018).  Therefore, UMGI's motion for summary

judgment as to Craig's claim for infringers' profits is denied.

### d.     Statutory Damages and Attorney's Fees

In addition to actual damages and infringers' profits, a copyright owner may elect instead

to seek statutory damages against copyright infringers under the Copyright Act.  17 U.S.C.

§ 504(a)(2).  A court may also award a reasonable attorney's fees to a prevailing plaintiff.  17

U.S.C. § 505.  Nonetheless, as a precondition to obtaining statutory damages and attorney's fees,

a plaintiff must have registered its copyright before the alleged infringement.  17 U.S.C. § 412;

*see also Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir. 1995).

It is not disputed that Craig registered his copyright for the Photographs in March 2014.

(Dkt. No. 92 ¶ 7.)  Therefore, Craig is not entitled to recover statutory damages or attorney's fees

for those alleged infringements that occurred prior to March 2014.  But Craig points out that in

November 2015—after his registration—UMGI released yet another album named *Ladies and*

*Gentlemen Mr. B.B. King* (the "2015 Album") containing one of the Photographs.  (*See* Dkt. No.

92 ¶ 35(i).)  Because the 2015 Album was released after the copyright registration, it could

EXHIBIT 7
Page 15 of 22

potentially entitle Craig to statutory damages. At issue is whether Craig would be entitled to seek statutory damages and attorney's fees for UMGI's 2015 Album if Craig succeeds in establishing UMGI's liability in this action.

Defendants argue that the 2015 release is merely a re-packaging of an earlier album named *Ladies and Gentlemen Mr. B.B. King* (the "2012 Album") that was initially released in 2012, prior to Craig's copyright registration. (Dkt. No. 78 at 19.) As a so-called re-packaging of the 2012 Album, Defendants contend, the 2015 Album is a continuation of the alleged infringement that commenced prior to Craig's registration in 2014. (Dkt. No. 78 at 19.) In opposition, Craig claims that the 2015 Album constitutes a separate act of infringement that commenced after the registration of the copyright. (Dkt. No. 90 at 14–15.)

Courts in this District have consistently applied a bright-line rule in cases where the first act of infringement in a series of ongoing infringements occurred prior to the work's copyright registration. *See, e.g.*, *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2016 WL 4126543, at *2–4 (S.D.N.Y. Aug. 2, 2016); *Steele v. Bell*, No. 11 Civ. 9343, 2014 WL 1979227, at *9 (S.D.N.Y. Mar. 28, 2014); *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.*, No. 04 Civ. 6189, 2008 WL 3906889, at *15–16 (S.D.N.Y. Aug. 21, 2008). "[W]hen the same defendant infringes on the same protected work in the same manner as it did prior to the work's registration, the post-registration infringement constitutes the continuation of a series of ongoing infringements." *Solid Oak Sketches*, 2016 WL 4126543, at *3. For example, an updated version of a video game released two years after its original is part of the same ongoing infringement. *See id.* Similarly, a "newly configured version of [a television] program" with a different title also constitutes a continuation of the program's earlier infringement. *Irwin v. ZDF Enters. GmbH*, No. 04 Civ. 8027, 2006 WL 374960, at *2 (S.D.N.Y. Feb. 16, 2006); *see also id.* at *6.

EXHIBIT 7
Page 16 of 22

Here, Craig does not cite any of these cases, much less attempt to distinguish them. The record clearly indicates that the 2015 Album is part of an ongoing infringement that commenced with the release of the 2012 Album. The 2015 Album has the same front cover and back cover as the 2012 Album, uses the same four photographs that appeared in the 2012 Album, and contains the same seventeen musical compositions and sound recordings that appeared in the 2012 Album. (Dkt. No. 83 ¶ 4.) The only difference is that the 2015 Album has fewer tracks and photographs than the 2012 Album. (Dkt. No. 83 ¶ 5.) In essence, by releasing the 2015 Album, UMGI infringed the same photographs in the same manner as it had done in releasing the 2012 Album. It is therefore beyond genuine dispute that the 2015 Album "constitutes the continuation of a series of ongoing infringements" that commenced with the 2012 Album. *Solid Oak Sketches*, 2016 WL 4126543, at *3.

In arguing to the contrary, Craig maintains, based on Null's deposition, that "UMGI employees concede that by their own standards the 2015 release is considered a new compilation." (Dkt. No. 90 at 14.) But Craig's argument misrepresents the record. Nowhere in Null's deposition excerpt submitted in the record does Craig's counsel or Null directly refer to the 2015 Album. (*See generally* Null Depo.) Viewing all evidence in the light most favorable to Craig, the closest he has come to probing the question of the 2015 Album's novelty is when his counsel asked Null if it would be unusual for UMGI to use the same cover from an old album in a new compilation, implicitly referring to the 2012 Album and the 2015 Album. (Null Depo. 61:2–8.) But Null categorically rejected such a possibility, stating that "[a] compilation would have new art . . . . We wouldn't do that." (*Id.* 61:9–13.) According to Null, a new compilation would have new a cover photo, new title, and new track list, and would therefore constitute a completely new collection. (*Id.* 40:9–12, 40:25–41:2, 59:16–60:2, 61:17–20.) The 2015 Album,

EXHIBIT 7
Page 17 of 22

which pulls its cover, title, and songs from the 2012 Album, does not fit Null's "new compilation" description.

Craig argues that construing the concept of "continuing infringement" in this way will reduce the deterrent effect that the Copyright Act's statutory damages provision has against potential infringers. (Dkt. No. 90 at 14.) The Court is not persuaded. "A defendant who continues infringing after registration will be subject to liability for actual damages, disgorgement of profits," and a possible injunction. *Steele*, 2014 WL 1979227, at *9. Such remedies are often sufficient to deter potential infringers and compensate copyright owners for their losses, thus serving the statutory purpose of deterring copyright infringement. In light of Craig's otherwise available remedies, the Court rejects Craig's argument and joins the other courts in this District that have adopted a bright-line rule. *Solid Oak Sketches, LLC*, 2016 WL 4126543, at *2–4; *Steel*, 2014 WL 1979227, at *8–9; *U2 Home Entm't, Inc.*, 2008 WL 3906889, at *15–16.

Because the alleged infringements occurred before Craig's registration of his copyright, UMGI is entitled to summary judgment on claims of statutory damages and attorney's fees. Because the Court denies statutory damages for Craig, the Court need not reach the remainder of Defendants' damages arguments.

### 3.    Liability Under the DMCA

Finally, Defendants move for summary judgment on Craig's DMCA claims. "The DMCA prohibits, among other things, 'intentionally remov[ing] or alter[ing] any copyright management information.'" *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 107 (2d Cir. 2014) (alterations in original) (quoting 17 U.S.C. § 1202(b)). Copyright management information ("CMI") includes the title and other information identifying the work and its author. 17 U.S.C. § 1202(c). To establish a DMCA violation under § 1202(b)(1), a plaintiff must

EXHIBIT 7
Page 18 of 22

establish "(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 664 (S.D.N.Y. 2017) (alteration in original) (quoting *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010)). Alternatively, a defendant may be liable under § 1202(b) for "distribut[ing copyrighted work] . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law." 17 U.S.C. § 1202(b)(3).

Here, Craig fails to present sufficient evidence to satisfy the intention prong under § 1202(b)(1) or the knowledge prong under § 1202(b)(3). Defendants argue that, even assuming the Photographs had CMI, it was removed by a third party prior to 1971, when the Photographs appeared without CMI in a music tour book. (Dkt. No. 78 at 24; *see also* Dkt. No. 79 ¶ 5; Dkt. No. 62-6 ("Craig Depo.") 55:13–25.) Craig neither adduces any evidence nor presents any alternative theory to rebut Defendants' claim. Nothing in the evidentiary record indicates that Defendants either intentionally removed the CMI or had reason to know that the CMI had been improperly removed when releasing the infringing albums. There is not even any evidence suggesting whether there was CMI on the Photographs when Defendants obtained them. Without any evidence from which the Court can draw a favorable inference for Craig, the Court must grant summary judgment in favor of Defendants with respect to the DMCA claim.

## B.    Motion for Sanctions

Defendants invoke 28 U.S.C. § 1927 and the court's inherent powers to sanction Craig, his counsel Richard Liebowitz, and the Liebowitz Law Firm PLLC for filing a meritless motion to disqualify Defendants' expert, Sedlik.

Under § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

EXHIBIT 7
Page 19 of 22

expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

To succeed under § 1927, a plaintiff must demonstrate "clear evidence that (1) the offending

party's claims were entirely meritless and (2) the party acted for improper purposes." *Revson*,

221 F.3d at 79 (citing *Agee*, 114 F.3d at 398). The second prong—bad faith—can be established

by inference from completely meritless actions. *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at

116; *see also Oliveri*, 803 F.2d at 1273 ("[A]n award under § 1927 is proper when the attorney's

actions are so completely without merit as to require the conclusion that they must have been

undertaken for some improper purpose such as delay."). Awards pursuant to § 1972 may be

imposed only against the attorney, not the client. *Id.*

        As became obvious at the evidentiary hearing on May 25, 2018, Craig's motion to

disqualify was entirely meritless. In order to have Sedlik disqualified, Craig had to show at least

that (1) it was objectively reasonable for him to believe that he had a confidential relationship

with Sedlik, and (2) he actually disclosed confidential information to Sedlik. *Rodriguez v.

Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003).

        In his motion to disqualify, Craig alleged through his counsel, and stated in a declaration,

that he had disclosed confidential information to Sedlik in a phone call which he thought was

confidential. (Dkt. No. 56 at 1–2.) But the evidentiary hearing revealed that Craig did not

disclose any confidential information to Sedlik. Contrary to what Craig's counsel has

mischaracterized as "explain[ing] the whole theory of the case to Mr. Sedlik" (Dkt. No. 56 at 7),

what Craig told Sedlik was simply the basic facts of the case, his career path, and his licensing

history—none of which can be categorized as confidential (Dkt. No. 73-1 ("Hrg. Trs.") 6:7–23).

The only allegedly "confidential" information—the discussion on Getty Image licensing fees—

was not only told *by* Sedlik *to* Craig, but also publicly available. (*Id.* 13:24–14:2, 22:9–16.) In

EXHIBIT 7
Page 20 of 22

fact, Craig also admitted that he let Sedlik lead the conversation on pricing and had little to contribute.  (*Id.* 16:2–4, 24:4–7.)  Nothing from Craig's testimony can be characterized as "litigation" or "settlement strategy."  (Dkt. No. 64 at 6–7.)

      In addition to the utter lack of merit to Craig's motion to disqualify, the Court concludes that the motion was made vexatiously and in bad faith.  Bad faith can be inferred if the action is completely without merit.  *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 116.  Such is the case here.  With the full knowledge that Craig had not disclosed any confidential information, Liebowitz went ahead and filed this meritless motion.  Liebowitz's bad faith is most evident in the omission of the details of the alleged conversation in the moving papers.  Those details were fatal to Craig's motion, and obviously so under a basic understanding of the applicable law.

      Plaintiff's counsel forced Defendants to prepare papers opposing his motion, and required the Court to hold a wasteful evidentiary hearing.  Such unnecessary delay and expense is precisely what Congress sought to eradicate when enacting § 1972.  *Oliveri*, 803 F.2d at 1273 ("[T]he purpose of [§ 1927] was to deter unnecessary delays in litigation." (quotation marks and citation omitted)).  Therefore, an award against Liebowitz and his firm pursuant to § 1972 is proper.

      The inherent powers of the Court also allow it to sanction parties and attorneys who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975) (quoting *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)).  The standard for imposing sanctions pursuant to the Court's inherent power is the same as that under § 1972: "(1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes."  *Revson*, 221 F.3d at 79. The Court's inherent powers also support an award of sanctions here.

EXHIBIT 7
Page 21 of 22

Because Liebowitz's "actions were indistinguishable from those of [the Liebowitz Law Firm PLLC] as a firm," *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012), the Court awards costs and fees against both Liebowitz and the Liebowitz Law Firm PLLC, jointly and severally.

The Court declines to sanction Craig himself. The basis for inferring bad faith is weaker as to Craig. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 116 (allowing the inference of bad faith from completely meritless actions in the context of § 1927). As distinct from Liebowitz, Craig is a layperson who lacks the legal acumen to assess the viability of his disqualification motion under the law. He may not have known that the motion was legally colorless before agreeing to its filing. Without any particularized showing of bad faith as to Craig, the Court will not impose sanctions on Craig.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. All claims against Defendants Kingsid Ventures, Ltd. and the Estate of Riley B. King are dismissed.

Defendants' motion for sanctions is GRANTED as to Richard Liebowitz and the Liebowitz Law Firm PLLC, and DENIED as to Plaintiff Glen Craig. Defendants shall submit, on or before April 26, 2019, a declaration with detailed contemporaneous time and disbursement records to substantiate the amount of fees and costs incurred in opposing Craig's motion to disqualify and preparing for and attending the evidentiary hearing.

The Clerk of Court is directed to close the motions at Docket Numbers 71 and 77.

SO ORDERED.

Dated: March 29, 2019
New York, New York

J. PAUL OETKEN
United States District Judge

22

EXHIBIT 7
Page 22 of 22